In the Matter of the Petition of Mahmoud El–Abed AHMAD, also known as "Mahmoud Abed Atta," Petitioner,

for a writ of Habeas Corpus as

v.

George WIGEN, as Warden of the Metropolitan Correctional Center of the Federal Bureau of Prisons, Romolo J. Imundi, as United States Marshal for the Southern District of New York, James A. Baker, as Secretary of State of the United States and Richard Thornburgh, as Attorney General of the United States, Respondents.

No. 89–CV–715.

United States District Court, E.D. New York.

Sept. 26, 1989.

Ramsey Clark, Lawrence W. Schilling, Peter B. Meadow, New York City, for petitioner.

Andrew J. Maloney, U.S. Atty., E.D. New York, Brooklyn, N.Y., for respondents; Jacques Semmelman, Asst. U.S. Atty., Murray R. Stein, U.S. Dept. of Justice, of counsel.

TABLE OF CONTENTS

I. Procedural History
II. Scope of Review
 A. Generally
 B. Res Judicata and Double Jeopardy
 C. Jurisdiction
 1. United States
 2. Israel
 D. Probable Cause
 E. Political Offense Exception
 1. Definition
 2. Burden of Proof
 3. Scope of Review
 4. Evidence

III. Requesting Nation's Probable Treatment of Petitioner
 A. Due Process Exception to the Rule of Non–Inquiry
 1. Generally
 2. United States Precedent
 3. International Precedent
 B. Burden of Proof
 C. Hearing in this Court
 1. Inhuman Treatment
 2. Prison Conditions
 3. Integrity of Requesting Nation's Criminal Justice System
IV. Conclusion

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

This case raises serious questions—some of them novel—about the United States' obligations under an extradition treaty and the courts' role in ensuring that those extradited are treated fairly. As indicated below, two changes in law must now be recognized: The "political offense" bar to extradition is narrowed to exclude terrorism and acts of war against civilians. A correlative expansion is required in courts' power to ensure that those extradited are granted due process and are treated humanely. Petitioner has been afforded due process in this country, and adequate guarantees exist that he will be fairly treated in Israel, the country seeking his extradition to stand trial for alleged terrorist acts against its citizens.

## I. PROCEDURAL HISTORY

Mahmoud El–Abed Ahmad seeks a writ of habeas corpus, 28 U.S.C. § 2241, to prevent his extradition to Israel to stand trial. On April 12, 1986, he allegedly attacked by firebombs and automatic weapons fire a passenger bus en route to Tel Aviv traveling between Israeli settlements in the occupied territory of the West Bank. Death of the bus driver and serious injury to one of the passengers resulted.

Petitioner, a naturalized United States citizen, formerly a resident of the West Bank, allegedly fled before he could be apprehended. His two alleged accomplices were convicted in Israel and sentenced to life imprisonment for their admitted participation in the planning and execution of the attack. In sworn statements, the co-conspirators implicated petitioner and described their mutual membership in the Abu Nidal Organization, an international terrorist group. That group publicly announced its responsibility for the attack.

A year later petitioner was located in Venezuela. Venezuelan officials detained him because of suspected activities in that country on behalf of the Abu Nidal Organization. Venezuela had no extradition treaty with Israel. The Venezuelan authorities advised the United States Ambassador that they were going to expel petitioner to his country of citizenship, the United States. Venezuela placed petitioner on a commercial airline flight from Caracas to the United States. During the flight FBI agents executed a warrant for the provisional arrest of petitioner issued by United States Magistrate John L. Caden of the Eastern District of New York.

Pursuant to the Convention on Extradition Between the Government of the United States and the Government of the State of Israel (the "Treaty"), Dec. 10, 1962, 14 U.S.T. 1707, T.I.A.S. No. 5476, Israel formally requested the extradition of petitioner from the United States on June 26, 1987. Each of the crimes petitioner is charged with under Israeli Penal Law—murder, attempted murder, causing harm with aggravating intent, attempted arson, and conspiracy to commit a felony—is covered by the Treaty.

Magistrate Caden held extradition hearings in December, 1987 and February, 1988 pursuant to 18 U.S.C. § 3184. In June, 1988 Magistrate Caden denied the extradition request on the ground that the attack on the passenger bus constituted a "political act" for which petitioner was immune from extradition under the Treaty and that, even if he were subject to extradition, the court lacked jurisdiction because petitioner had been brought illegally into the United States. *In re Extradition of Atta*, 87–0551–M, 1988 WL 66866 (E.D.N.Y. June 17, 1988) (LEXIS 60001).

The United States Attorney filed a second extradition complaint seeking *de novo*

consideration. An independent extradition hearing was then held before United States District Judge Edward R. Korman, sitting as an extradition magistrate. He relied on the record before Magistrate Caden and additional evidence received between July and October of 1988. Each party called witnesses and offered exhibits. The court called an expert witness who testified by telephone from Israel.

On February 14, 1989 Judge Korman granted the extradition request. He held that res judicata and double jeopardy did not bar the second complaint; if there were any impropriety in the manner petitioner was deported from Venezuela to the United States it did not deprive the court of jurisdiction; the crime alleged was not within the political offense exception to the Treaty; and there was sufficient probable cause to certify petitioner for extradition. *In re Extradition of Atta*, 706 F.Supp. 1032 (E.D.N.Y.1989) (hereafter *Ahmad*).

By petition for a writ of habeas corpus, petitioner appealed from Judge Korman's order on March 3, 1989. He contended that his alleged crime constituted a political act, that there was insufficient probable cause shown, that Judge Korman lacked jurisdiction and that the court was barred by res judicata and double jeopardy from reconsidering the extradition request denied by Magistrate Caden. In addition, petitioner claimed that should he be extradited to Israel he would face procedures and treatment "antipathetic to a court's sense of decency." Because this final ground had not been raised in any prior proceeding, petitioner requested an evidentiary hearing to demonstrate that the Israeli judicial system would not afford him due process and that he would be subject to conditions of detention and interrogation in violation of universally accepted principles of human rights.

The government opposed petitioner's request for a hearing. It asserted that the scope of habeas review is extremely narrow and that the rule of non-inquiry prohibited the court from inquiring into the integrity of the requesting state's judicial system. Neither side requested that the issue

be referred to Judge Korman. The petition was referred to the present judge by random selection.

On May 16, 1989 this court ruled from the bench that it would consider petitioner's due process claim and permit both parties to submit further evidence on this and any other issue. The government sought a writ of mandamus from the Court of Appeals for the Second Circuit to prohibit the court from holding a hearing and from receiving evidence on the probable nature of the judicial procedures of the requesting nation in an extradition matter. On June 20, 1989 the Court of Appeals denied the writ of mandamus.

This court held evidentiary hearings in July and August of 1989 to supplement the record before Magistrate Caden and Judge Korman. Both parties submitted documentary evidence. Petitioner called four witnesses to testify on the Israeli judicial process and conditions of detention: Professor John Quigley, Abdeen M. Jabara, Leah Tsemel, Esq. and Sami Esmail. Preserving its objection to the proceedings, respondent called two witnesses, Professors Alan Dershowitz and Monroe Freedman, and submitted statements of United States officials who had observed trials in Israel. A representative of the Israeli government certified the protections petitioner would receive in Israel. *See Appendix* attached *infra.* The parties then fully briefed and argued the case in September, 1989.

In all, some fourteen days of evidentiary hearings, and extensive oral arguments based upon full briefs and the court's own research, were devoted to this case. Petitioner has had a full opportunity to be heard.

## II. SCOPE OF REVIEW

### A. Generally

■ The sole mechanism for review of a magistrate's order approving extradition is a collateral habeas corpus proceeding. There is no statutory provision for a direct appeal. *Collins v. Miller*, 252 U.S. 364, 369, 40 S.Ct. 347, 349, 64 L.Ed. 616 (1920) ("proceeding before a committing magis-

trate in international extradition is not subject to correction by appeal"); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 576 (6th Cir. 1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Jhirad v. Ferrandina*, 536 F.2d 478, 482 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).

In extradition cases, the scope of habeas corpus review is limited, according deference to the magistrate's (here Judge Korman's) determination. Courts have uniformly purported to stay within the scope of review established by Justice Holmes in *Fernandez v. Phillips*, 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925):

> [Habeas corpus review] is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offence charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty.

*See, e.g., Demjanjuk v. Petrovsky*, 776 F.2d 571, 576 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Eain v. Wilkes*, 641 F.2d 504, 509 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Quinn v. Robinson*, 783 F.2d 776, 790 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

In practice, however, habeas review in extradition cases has been somewhat broader than Justice Holmes suggested should be the case. *See, e.g., Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978) ("[T]he 'victim' of an extradition order generally gets a pretty broad review under habeas corpus, notwithstanding preachments that it is extremely limited.") (Chambers, C.J., concurring). For example, district courts have reviewed the political offense exception on habeas corpus as a part of their inquiry into whether the offense charged is covered by the treaty. *See, e.g., Gallina v. Fraser*, 177 F.Supp. 856, 868 (D.Conn.1959), *aff'd*, 278 F.2d 77 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960); *In re Doherty*, 599 F.Supp. 270, 273 (S.D.N.Y. 1984); *Eain v. Adams*, 529 F.Supp. 685, 687 (N.D.Ill.1980), *aff'd sub nom., Eain v. Wilkes*, 641 F.2d 504, 520 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). Habeas corpus review has also been expanded to include examination of procedural defects in the extradition process that are of constitutional magnitude, and of the constitutionality of the executive branch's conduct in deciding to extradite the accused. *See In re Extradition of Burt*, 737 F.2d 1477, 1484 (7th Cir.1984); *Plaster v. United States*, 720 F.2d 340, 347–49 (4th Cir.1983). Authority on a habeas corpus petition to examine the conditions the extraditee will be subjected to in the requesting nation to ensure that they comply with fundamental notions of humane treatment and due process is addressed separately in Section III A, *infra.*

This broadening of review parallels the expanded scope of habeas corpus jurisdiction over state court proceedings that has developed since *Fernandez* was decided. At that time, habeas corpus writs were granted only if the committing court lacked jurisdiction. *See In re Extradition of Burt*, 737 F.2d 1477, 1482 (7th Cir.1984). 28 U.S.C. § 2254 codifies the numerous grounds on which writs of habeas corpus may now be granted. It is well settled that "[w]hen the allegations of a habeas petition, if proved, would entitle a petitioner to relief, a federal court 'must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in state court.'" *Maddox v. Lord*, 818 F.2d 1058, 1061 (2d Cir.1987) (*quoting Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963)). As the Court of Appeals put the matter in *Hayden v. United States*, 814 F.2d 888, 892 (2d Cir.1987), a case challenging a federal conviction,

A petition for habeas corpus requires a hearing to resolve disputed issues of fact unless the record shows that the petitioner is not entitled to relief. 28 U.S.C. § 2255. We have consistently held that the standard to be used in making this determination is whether, "if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief."

Even where the petitioner has been afforded a full and fair hearing by the state court, a federal court judge "has the power ... to receive evidence bearing upon the applicant's constitutional claim." *Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963).

In his petition for habeas corpus relief, petitioner set forth evidence he contended controverted Judge Korman's findings. An expanded record and hearing was then required to resolve the complicated issues of fact and law that two extradition magistrates previously had decided so disparately and to permit petitioner to demonstrate the merits of his due process claim. Should there be an appeal, the appellate court or courts will have a fully developed record.

■ As with habeas review of state court findings, an extradition magistrate's purely factual findings are reviewed under the clearly erroneous standard, while mixed determinations of fact and law, such as the political offense issue, and questions solely of law must be reviewed *de novo*. *See Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). Each of Judge Korman's findings will be addressed in turn.

### B. Res Judicata and Double Jeopardy

■ Judge Korman held that as a matter of law the United States Attorney was entitled to file a second extradition complaint after Magistrate Caden had denied the initial extradition request. *Ahmad*, 706 F.Supp. at 1036. Even though this procedure permits the United States Attorney to relitigate issues of fact and law that have been decided by a magistrate, a *de novo* extradition hearing is permissible and does not violate principles of res judicata or double jeopardy. *See, e.g., Collins v. Loisel*, 262 U.S. 426, 429–30, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923) (double jeopardy principles are inapplicable to multiple extradition applications); *United States v. Doherty*, 786 F.2d 491, 501 (2d Cir.1986) (upon denial of extradition request, sole recourse for government is to file request for another proceeding; application of res judicata is inappropriate); *Hooker v. Klein*, 573 F.2d 1360, 1366 (9th Cir.), *cert. denied*, 439 U.S. 932, 99 S.Ct. 323, 58 L.Ed.2d 327 (1978) (only limitation on number of extradition requests is that each such request must be based on good faith determination "that extradition is warranted").

The proceedings here were neither vindictive nor designed to harass the petitioner—two of the evils which double jeopardy prevents. *Cf. Green v. United States*, 355 U.S. 184, 187–88, 78 S.Ct. 221, 223–24, 2 L.Ed.2d 199 (1957). They were intended to meet the problem of the government's lack of power to appeal the denial of extradition. *See United States v. Doherty*, 615 F.Supp. 755 (S.D.N.Y.1985), *aff'd*, 786 F.2d 491, 495–96 (2d Cir.1986). It would be desirable to allow an appeal by either side from an extradition decision. But this is a matter for the legislature, not the courts. (Legislation to this effect has been proposed but not yet enacted. *See* Proposed Extradition Act of 1984, H.R. 3347, 98th Cong., 2d Sess. § 3195(a)(1), *reprinted in* H.Rep. 998, 98th Cong., 2d Sess. 54 (1984) (permitting appeal from an extradition order by government or defendant).)

### C. Jurisdiction

#### 1. United States

■ Petitioner contends that Judge Korman lacked jurisdiction because petitioner was illegally forced into the United States, not "found" here. Article I of the Treaty provides that the United States is obligated to extradite "persons found in its territory." An extradition magistrate has jurisdiction over any person "found within his jurisdiction." 18 U.S.C. § 3184.

Petitioner has not produced any evidence to discredit Judge Korman's factual finding that "the United States did not instigate the defendant's arrest, that it was not responsible for the conditions of his confinement and that it did everything possible to encourage Venezuela to deport him to Israel rather than the United States." *Ahmad,* 706 F.Supp. at 1036–37. In light of the series of telegrams sent in April and May of 1987 from the State Department to the American embassy in Caracas, Venezuela, Judge Korman's finding was obviously required. There is credible evidence showing that petitioner was properly deported by Venezuelan officials to the United States, his country of citizenship, upon his detention for suspected involvement in a terrorist organization which might be operating in Venezuela. His eventual presence in the United States was not the result of forcible abduction. The jurisdictional requirement that he be "found" in this territory was satisfied.

■ Even if the United States had requested his deportation from Venezuela to this country, petitioner provides no more than vague allegations of impermissible conduct by United States agents in connection with his arrest, detention and deportation. They do not rise to the level of due process violations. In *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974), the Court of Appeals held that "a court [must] divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights." *Id.* at 275. In order to trigger a due process violation, the government conduct must be so outrageous and reprehensible as to "shock the conscience." *See United States ex rel. Lujan v. Gengler,* 510 F.2d 62, 66 (2d Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (absent any contention of torture, terror, or custodial interrogation, abduction of petitioner from Bolivia to United States for arrest under indictment in New York did not constitute a violation of due process). *See also David v. Attorney General,* 699 F.2d 411, 414 (7th Cir.), *cert. denied,* 464 U.S.

832, 104 S.Ct. 113, 78 L.Ed.2d 114 (1983) (abduction to United States does not deprive court of jurisdiction over extradition proceeding). Petitioner's bald assertion that the United States forcibly kidnapped him in violation of his constitutional rights not only is unsupported by the evidence but is insufficient as a matter of law to divest this court of jurisdiction.

### 2. Israel

■ There is no merit to petitioner's contention that Israel lacks jurisdiction to try petitioner because the acts with which he is charged occurred within the occupied territory of the West Bank and trial in an Israeli court would violate the Fourth Geneva Convention of 1949. *See* Convention (IV) Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, T.I.A.S. No. 3365, 75 U.N.T.S. 287. Even if, as petitioner argues, under paragraph 1 of article 64 of the Convention the criminal laws of Jordan rather than Israel applied in the occupied territory, that fact would be irrelevant.

Israel is not relying on a territorial basis for jurisdiction. It is prosecuting petitioner under its statutes protecting Israeli citizens wherever they are found, relying on passive personality and protected state interest bases of jurisdiction. *See generally* M. Bassiouni, *International Extradition and World Public Order* 255–61 (1974) (describing these bases of jurisdiction, and noting the Israeli law). Under section 7(a) of the penal law of Israel, 5737–1977 (as amended):

> The courts in Israel shall be competent to try under Israeli law a person who committed abroad an act which would have been an offense had it been committed in Israel and which injured or was intended to injure the life, person, health, freedom or property of an Israeli national or resident of Israel.

The United States recognizes nationality of the victim as a basis for criminal jurisdiction. *See* Terrorist Acts Abroad Against United States Nationals, 18 U.S.C. § 2331 (allowing prosecution in the United States of persons charged with violent crimes

committed against our nationals anywhere in the world). *See also* Kane, *Prosecuting International Terrorists in United States Courts: Gaining the Jurisdictional Threshold,* 12 Yale J.Int'l L. 294, 297 (1987) (describing the United States statute, and noting bases for jurisdiction instead of territoriality: passive personality, protected interest, and the universality of the offense of terrorism).

The driver killed was an Israeli national. He was entitled to the Israeli statute's protection.

In view of its nonapplicability, we need not decide whether—as strongly urged by petitioner—he, as a private person, may claim the protection of the Fourth Geneva Convention based upon his presence in the occupied territory at the time of the alleged crime. It should be noted, however, that an argument similar to petitioner's was rejected in *American Baptist Churches in the U.S.A. v. Meese,* 712 F.Supp. 756 (N.D. Cal.1989). Plaintiffs were Salvadoran and Guatemalan aliens in the United States facing deportation to their respective countries of origin. Plaintiffs claimed they were entitled to a "temporary refuge in [the United States] until the internal armed conflict in their homelands ceases or they are resettled in a third country." *Id.* at 767 n. 6. They contended the conditions in their homelands violated article 3 of the Fourth Geneva Convention, which "prescribes the protections that must be provided to civilians during non-international armed conflict." *Id.* at 769. Plaintiffs reasoned that "by deporting Salvadorans and Guatemalans to countries where article 3 violations are occurring, the United States has failed to 'respect and ensure respect' for the Convention within the meaning of Article I." *Id.* The court rejected the argument, holding that article I of the Fourth Geneva Convention does not confer any rights on private litigants. It found that article I "does not impose any specific obligations on the signatory nations, nor does it provide any intelligible guidelines for judicial enforcement." *Id.* at 770. The court concluded that "Geneva Convention IV does not provide any right of temporary refuge · to Salvadorans or Guatemalans within this country." *Id.* If the Fourth Geneva Convention presents no obstacle to deportation, it follows, the government argues, that the Convention cannot impair extradition, since "[e]xtradition is subject to specific international obligations while deportation is essentially at the option of the deporting country." *In re Geisser,* 627 F.2d 745, 746–47 n. 1 (5th Cir.1980), *cert. denied,* 450 U.S. 1031, 101 S.Ct. 1741, 68 L.Ed.2d 226 (1981). We prefer not to rely upon this last argument because of its negative implications on the court's obligations and power to protect extraditees, particularly those who are American citizens.

### D. Probable Cause

Petitioner challenges the sufficiency of the evidence supporting Judge Korman's finding of probable cause to believe that petitioner committed the acts for which his extradition is requested. *Ahmad,* 706 F.Supp. at 1050. Article V of the Treaty provides that "Extradition shall be granted only if the evidence be found sufficient, according to the laws of the place where the person sought shall be found, ... to justify his committal for trial." The scope of review of Judge Korman's finding of probable cause is limited to determining whether there was persuasive "evidence" of guilt. *See Fernandez v. Phillips,* 268 U.S. 311, 312, 45 S.Ct. 541, 542, 69 L.Ed. 970 (1925); *Shapiro v. Ferrandina,* 478 F.2d 894, 901 (2d Cir.), *cert. denied,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *Eain v. Wilkes,* 641 F.2d 504, 509 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

To ascertain whether probable cause existed, Judge Korman correctly applied the following appropriate standard:

To establish the level of probable cause necessary to certify one for extradition, evidence must be produced that is "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *Coleman v. Burnett,* 477 F.2d 1187, 1202 (D.C.Cir.1973). The primary source of evidence for the probable cause determination is the extradition re-

quest, and any evidence submitted in it is deemed truthful for purposes of this determination. *Collins v. Loisel,* 259 U.S. 309, 315–16, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922).

*Ahmad,* 706 F.Supp. at 1050–51. Judge Korman had before him Israel's extradition request which included sworn affidavits from petitioner's two alleged accomplices directly implicating petitioner in the attack and a videotape reenactment by one of the accomplices depicting petitioner's participation in the attack.

In his petition for habeas relief, as at the hearing before Judge Korman, petitioner contended that the accomplice testimony is inherently unreliable, self-contradictory, coerced, the result of torture and not corroborated by relevant evidence. Judge Korman found that the accomplice testimony was corroborated by ballistics reports on an Uzi sub-machine gun tying one of the accomplices to the attack, by authenticated Israeli documents and by petitioner's passport accounting for his travels and whereabouts since 1974 which the accomplices had independently detailed. *Ahmad,* 706 F.Supp. at 1051. He also found that while credible evidence demonstrated that torture had been used by Israeli officials at times to obtain confessions, there was "no evidence that the confessions here were coerced or that they are not reliable." *Id.* The videotape of a person identified as one of the accomplices, being advised of his rights in Arabic, relaxed and showing no signs of abuse, reenacting the attack on the bus at its scene, belied suggestions by petitioner that he had been implicated only because the witnesses against him had been tortured.

As a matter of law, accomplice testimony is sufficient even without corroboration to demonstrate probable cause to certify the accused for extradition. *Eain v. Wilkes,* 641 F.2d 504, 510 & n. 5 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (citing *Suhl v. United States,* 390 F.2d 547 (9th Cir.1968), and other cases where uncorroborated accomplice testimony was sufficient to support conviction). Where accomplice testimony is corroborated by other reliable evidence, it will, *a fortiori,* support a finding of probable cause. *Id.* at 510 (citing *United States v. Boyce,* 594 F.2d 1246 (9th Cir.), *cert. denied,* 444 U.S. 855, 100 S.Ct. 112, 62 L.Ed.2d 73 (1979), and other cases where corroborated accomplice testimony was sufficient to support a finding of probable cause to issue an arrest warrant).

There is force to petitioner's argument that inconsistencies among the various confessions and internal indicia of unreliability suggested that the statements were dictated to, rather than by, the alleged accomplices. For example, the petitioner is referred to as "Atta," the name on his Israeli identification, rather than "Ahmad," the name by which he was known.

Nevertheless, there was, as already noted, substantial internal and external evidence of the truth of the accomplices' statements. Because the extradition magistrate does not sit to try the guilt or innocence of the accused, the petitioner is generally afforded only a limited right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial. *Shapiro v. Ferrandina,* 478 F.2d 894, 905 (2d Cir.), *cert. denied,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973). *See Collins v. Loisel,* 259 U.S. 309, 315–16, 42 S.Ct. 469, 471–72, 66 L.Ed. 956 (1922) (challenges to evidence submitted by United States in extradition proceeding not permissible). The evidence of petitioner's guilt would more than support an indictment in this country. It was properly found sufficient for extradition. As pointed out in Section III C(3), *infra,* petitioner will have a full opportunity to challenge the credibility of his alleged accomplices' confessions at a trial in Israel under the rules of evidence in that country and with the added advantage that the accomplices may be called by him to testify.

In any event, even if Judge Korman had found the confessions were coerced, he could give whatever weight to them that he believed they deserved. *Cf. United States v. Bloom,* 865 F.2d 485, 491–92 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 1762, 104 L.Ed.2d 197 (1989) (jury need not dis-

regard a coerced confession but may give it such weight as it deserves). There is no ground to reverse Judge Korman's finding of probable cause.

### E. Political Offense Exception

Petitioner concedes that his alleged offense would be extraditable as a form of criminal homicide were it not, in his submission, a political act and therefore immune from extradition under the Treaty. Four questions arise: What is a political offense? Who bears the burden of proof in determining whether petitioner's act was a political offense? What is the scope of review of the magistrate's determination? Was petitioner's offense political?

#### 1. Definition of A Political Offense

■ Article VI, paragraph 4 of the Treaty states that extradition will not be granted when "the offense is regarded by the requested Party [the United States] as one of a political character." The term "political" is not defined. General law of this country governs construction of the phrase. *See Eain v. Wilkes,* 641 F.2d 504, 508, 512 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

■ There are two classes of political offenses: first, "pure" or directly political and, second, "relative" or incidentally political. An act is considered a pure political offense if it is directed against the state and involves none of the elements of ordinary crime. The violence, if any, is minor and rarely involves private victims. Such offenses include treason, sedition and espionage, *Eain v. Wilkes,* 641 F.2d 504, 512 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); *Quinn v. Robinson,* 783 F.2d 776, 793 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986); Garcia–Mora, *The Nature of Political Offenses: A Knotty Problem of Extradition Law,* 48 Va.L.Rev. 1226, 1234 (1962), and acts of prohibited speech, such as speaking against ruling authority, demonstrating peacefully, flag burning or waving and the like. *Restatement (Third) of the Foreign Relations Law,* § 476, Reporters' Note 4, at 574 (1986) (hereafter Restatement).

■ Pure political offenses are often specifically excluded from the list of extraditable crimes in a treaty. *Quinn v. Robinson,* 783 F.2d at 794. Even if the treaty is silent, courts generally agree that they do not provide a basis for extradition because the purpose of the political offense exception is to protect individuals' rights to foster political change through relatively peaceful political activity. Petitioner's alleged offense of killing a civilian bus driver was not such an act.

■ An act may be a "relative" political offense when it is an otherwise common crime committed as a political act or for political motives or in a political context. *Eain v. Wilkes,* 641 F.2d at 512; *Quinn v. Robinson,* 783 F.2d at 794; M. Bassiouni, *International Extradition and World Public Order* 383 (1974); Garcia–Mora, *The Nature of Political Offenses: A Knotty Problem of Extradition Law,* 48 Va.L.Rev. 1226, 1239 (1962); *Restatement, supra,* § 476, Reporters' Note 4, at 574. Petitioner contends that his alleged crime of murder had sufficient political overtones to constitute a relative, non-extraditable political offense.

Anglo–American law governing the political offense exception has focused on the scope of "relative" political offenses. To delimit this category for the purposes of the extradition exception, American courts have adopted the "incidence test" of *In re Castioni,* [1891] 1 Q.B. 149, 166 (1890), determining that an act is a political offense when it is "incidental to and formed a part of a political disturbance." *See Ornelas v. Ruiz,* 161 U.S. 502, 509, 16 S.Ct. 689, 691, 40 L.Ed. 787 (1896) (act must be "in aid of a political revolt, an insurrection or a civil war"); *In re Ezeta,* 62 F. 972 (N.D. Cal.1894) (there must be "'an uprising,' and ... the acts in question must be incidental to it"); *Sindona v. Grant,* 619 F.2d 167, 173 (2d Cir.1980) (act must be "incidental to severe political disturbances such as war, revolution and rebellion"); *Garcia–Guillern v. United States,* 450 F.2d 1189, 1192 (5th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972)

(act must be "in the course of or incidental to" a "violent political disturbance"). As indicated below, the courts have gone further in developing the test of a political offense than requiring "incidence" alone.

Defining a political act is itself a form of political act, changing with the nature of the extraditing nation's foreign relations and treaties. By assigning this task in part to the judiciary, the executive branch avoids political or economic repercussions or accusations that it is not diligent in the enforcement of its treaty obligations or that it is interfering in the internal affairs of another nation. *See Eain v. Wilkes,* 641 F.2d 504, 513 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981); Note, *Bringing the Terrorist to Justice: A Domestic Law Approach,* 11 Cornell Int'l L.J. 71, 74 (1974) (politics need not present barrier to extradition if executive defers to judiciary). This division of responsibility also reduces the risk "that majoritarian consensus or favor due or not due to the country seeking extradition will interfere with individual liberty." *Quinn v. Robinson,* 783 F.2d 776, 789 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986).

The State Department retains a key role in the determination of whether the political offense exception applies. Courts have not applied the incidence test in a foreign policy vacuum. Views of the State Department have been taken into account either explicitly or implicitly. *See Eain v. Wilkes,* 641 F.2d 504, 515 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) ("Even though we do not leave sole determination to the Executive branch, we believe its views are entitled to great weight in extradition matters."); *see also Demjanjuk v. Petrovsky,* 776 F.2d 571, 579 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) (interpretation of treaty language by the Department of State is "entitled to considerable deference"); *Charlton v. Kelly,* 229 U.S. 447, 468, 33 S.Ct. 945, 952, 57 L.Ed. 1274 (1913) ("A construction of the treaty by the political department of the government, while not conclusive upon a court ... is nevertheless of much weight.").

Judge Korman received testimony regarding the State Department's position that the political offense exception is not applicable to violent attacks on civilians. *Ahmad,* 706 F.Supp. at 1039 & n. 5, 1041. *See also Eain v. Wilkes,* 641 F.2d 504, 515 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (legal advisor for the State Department's Office of Combatting Terrorism testified that "indiscriminate use of violence against civilian populations, innocent parties, is a prohibited act, and as such, is a common crime of murder, punishable in both [Israel and the United States]."). The State Department's view deserves deference, unless it represents a substantial departure from national or international norms. Given the national and increasingly international condemnation of terrorism, Judge Korman's recognition of the State Department's view was appropriate. *See, e.g.,* G.A. Res. 61, 40 U.N. GAOR Supp. (No. 53), U.N. Doc. A/40/53, at 301 (1985) (General Assembly of the United Nations' recognition of the need of member states to cooperate in combating terrorism through apprehension, extradition and prosecution of terrorists); Council of Europe, European Convention on the Suppression of Terrorism, arts. 1 & 2, 25 Eur. Y.B. 289, 289–90 (1977), 15 I.L.M. 1272, 1272–73 (1976) (excluding terrorist acts from the political offense exception to treaties between members of Council of Europe), 16 *id.* 1329 (1977) (reservations and declarations of signatories); Protocol Additional to the Geneva Conventions of 12 August, 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I), art. 51(2), adopted June 8, 1977, 16 I.L.M. 1396, 1413 (hereafter Protocol I), *reprinted in* L. Henkin, R. Pugh, O. Schachter & H. Smit, *Basic Documents Supplement to "International Law Cases and Materials"* 195, 202 (2d ed. 1987) (hereafter Documents Supplement) (condemning violence designed to spread terror among civilian populations); Protocol Additional to the Geneva Convention of 12 August, 1949, and Relating to the Protection of Victims of Non–International Armed Conflicts (Protocol II) art. 4(2)(d), 16

I.L.M. 1442, 1444 (1977), *reprinted in Documents Supplement, supra,* 213, 215; 1984 Act to Combat International Terrorism, Pub.L. No. 98–533, 98 Stat. 2706 (seeking more effective international cooperation in the extradition of all terrorists); Gates, *The Role of Analysis in Combating Modern Terrorism,* FBI L. Enforcement Bull., June, 1989, at 1 (discussing resources utilized in combating terrorism); Kane, *Prosecuting International Terrorists in United States Courts: Gaining the Jurisdictional Threshold,* 12 Yale J. Int'l L. 294, 295 (1987) (pointing out rise in terrorism and need for criminal justice system to adapt to deal with it); Lubet, *Extradition Reform: Executive Discretion and Judicial Participation in the Extradition of Political Terrorists,* 15 Cornell Int'l L.J. 247, 291 (1982) (advocating reforms to "ensure that the courts do not extend the protection for the exception to those who practice violence against civilians"); *id.* at 253 ("In recent times ... the philosophic concept of broad protection for political offenders has eroded in view of the phenomenon of terrorism."); Lubet & Czaczkes, *The Role of the American Judiciary in the Extradition of Political Terrorists,* 71 J.Crim.L. & Criminology 193, 200 (1980).

Attacks on civilians and other terrorist activities have created substantial problems for this and other nations. Terrorism tears the ligaments of civility and security that peacefully bind us together in our communal daily life. Current United States policy on terrorism cannot be ignored when courts define political offenses for extradition purposes. *Cf. United States v. Leitner,* 627 F.Supp. 739, 741 (E.D.N.Y.), *aff'd,* 784 F.2d 159, 161 (2d Cir.1986) ("This country has an obvious stake in its ability to produce extradited persons. That interest is magnified where a defendant is charged with acts of terrorism, a matter of increasingly grave concern to this and every other civilized country."). The current threat of terrorism to the peaceful expectations of civilians for a secure and safe society is so great as to either require some limitations on the political offense doctrine or an interpretation placing such offenses outside its

protection. *See Quinn v. Robinson,* 783 F.2d 776, 803–06 (9th Cir.), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986) (collecting cases and attempting its own limitation based on a theory of territoriality).

Courts have recently disagreed over whether the traditional incidence test conforms to the changing realities of the modern world. Some have reappraised the validity of the test in light of current terrorism. In *Eain v. Wilkes,* 641 F.2d 504 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981), for example, a member of the Palestine Liberation Organization (PLO) accused of exploding a bomb that killed two and injured thirty-six civilians in a public square in the Israeli city of Tiberias sought the protection in this country of the political offense exception. The Seventh Circuit held that the political offense exception was not meant to protect "the indiscriminate bombing of a civilian populace ... even when the larger 'political' objective of the person who sets off the bomb may be to eliminate the civilian population of a country." *Id.* at 521. The court reasoned that:

> If ... all that was necessary in order to prevent extradition under the political offense exception [were evidence that the organization to which the accused belongs seeks destruction of the Israeli political structure through the elimination of its population], nothing would prevent an influx of terrorists seeking a safe haven in America.... The law is not so utterly absurd.... We recognize the validity and usefulness of the political offense exception, but it should be applied with great care lest our country become a social jungle and an encouragement to terrorists everywhere.

*Id.* at 520. The *Eain* court recognized the necessity of balancing the policy interests underlying the exception with those interests necessitating its limits, to insure that the exception does not afford immunity to those who commit atrocities for political ends. The court concluded that the indiscriminate use of violence against civilians will not be regarded as a political offense,

regardless of whether it is incidental to political upheaval. *Id.* at 521. *Accord, In re Extradition of Demjanjuk,* 612 F.Supp. 544, 570 (N.D.Ohio), *aff'd sub nom., Demjanjuk v. Petrovsky,* 776 F.2d 571 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986).

The opinion of Judge Reinhardt of the Ninth Circuit, after an extensive historical analysis of the political offense exception, rejected the *Eain* position and held that even an atrocity, if undertaken for "purely political purposes," qualifies as a non-extraditable political act. *Quinn v. Robinson,* 783 F.2d 776, 806 (9th Cir.) (one judge concurring and one concurring and dissenting), *cert. denied,* 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). In *Quinn,* a member of the Irish Republican Army (IRA) was accused of conspiracy to cause letter bomb explosions in London and the murder of a police constable seeking to apprehend him for that offense. The court held the political offense exception inapplicable under the incidence test only because the political uprising in Ireland did not extend to England. It wrote:

> [I]t is not our place to impose our notions of civilized strife on people who are seeking to overthrow the regimes in control of their countries....
>
> ....
>
> We believe the tactics that are used in ... political internal struggles are simply irrelevant to the question whether the political offense exception is applicable.

*Id.* at 804–05.

Judge Duniway, concurring in the result, disagreed with the majority viewpoint:

> I much prefer the rationale of the Seventh Circuit in *Eain v. Wilkes,* 7 Cir., 1981, 641 F.2d 504.... I cannot believe that the framers of the treaty intended that the exception would embrace the kind of activities that the record in this case reveals.

*Id.* at 819. The *Quinn* majority found that there was no justification for distinguishing between attacks on military and civilian targets because:

> It is for the revolutionaries, not the courts, to determine what tactics may help further their chances of bringing down or changing the government. All that the courts should do is determine whether the conduct is related to or connected with the insurgent activity.

*Id.* at 810. *Cf. In re Requested Extradition of Mackin,* Mag. No. 80 Cr.Misc. 1, p. 54, slip op. (S.D.N.Y. Aug. 13, 1981) (political act exception applied to member of IRA accused of murdering a British soldier in Northern Ireland), *appeal dismissed,* 668 F.2d 122 (2d Cir.1981); *In re McMullen,* No. 3–78–1099 MG (N.D.Cal. May 11, 1979) (political act exception applied to former member of IRA accused of murder in connection with the bombing of a military barracks in England). In reaction to the *Mackin and McMullen* decisions, and shortly before *Quinn* was decided, the United Kingdom and United States concluded a Supplementary Extradition Treaty, expressly excluding from the political offense exception serious offenses typically committed by terrorists, including hijacking, hostage taking, murder, kidnapping and specified offenses relating to the use of explosives, firearms or ammunition. *See Supplementary Treaty Concerning the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland,* 24 I.L.M. 1105 (1985).

In finding no distinction between targets, the Ninth Circuit ignored the fact that the civilian status of victims has been a significant factor in the political offense calculus since the nineteenth century. *See Ornelas v. Ruiz,* 161 U.S. 502, 511, 16 S.Ct. 689, 692, 40 L.Ed. 787 (1896) (magistrate's refusal to apply exception justified "in view of the character of the foray, the mode of attack, *the persons killed or captured,* and the kind of property taken or destroyed") (emphasis added). *See also In re Extradition of Demjanjuk,* 612 F.Supp 544, 570 (D.C.Ohio), *aff'd sub nom., Demjanjuk v. Petrovsky,* 776 F.2d 571 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) ("[T]he focus of inquiry is on the circumstances and status of those harmed and not merely on whether

405

the acts were committed during the disorder."); *Eain v. Wilkes*, 641 F.2d 504, 523 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (discussing *Ornelas* ).

While seemingly harsh, there is something to be said for the traditional expansive view of a political offense, approved by the Ninth Circuit, in terms of modern conditions. It enables the courts to avoid such fuzzy issues as whether the "civilians" attacked were members of paramilitary forces. In the murky area of internal conflicts taking place all over the world the roles of the various parties are often unclear. Courts may compound their difficulties in dealing with extradition by engaging in such inquiries. Moreover, foreign governments may find it easier to reach out to this country for assistance in returning those who oppose their policies in what are contended to be civil wars of liberation against dictatorial governments. To enforce extradition orders under such circumstances may implicate our courts in grave injustices and cruel repressions. *Cf. Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948). But charges can be trumped up by a foreign government no matter what the legal criteria. Some reliance on the alertness, good sense and bona fides of our State Department and our courts seems justified as insurance against abuse by foreign governments. On balance, we cannot say that the current State Department view is wrong as a matter of law or policy.

Nevertheless, it should be emphasized that as a corollary to limiting the protection of the political offense doctrine, there is the need for increased vigilance of the courts and expansion of their power of inquiry. This issue is discussed at some length in Section III, *infra*.

The more restrictive definition of political offense currently favored by our government was embodied in *In re Doherty*, 599 F.Supp. 270 (S.D.N.Y.1984), followed by Judge Korman. In that case Judge Sprizzo, excluding attacks on civilians from its protection, held that:

[N]o act [should] be regarded as political where the nature of the act is such as to be violative of international law, and inconsistent with international standards of civilized conduct. Surely an act which would be properly punishable even in the context of a declared war or in the heat of open military conflict cannot and should not receive recognition under the political exception to the Treaty.

*Id.* at 274.

Judge Korman agreed. He found that the military "Rules of Engagement" provide a manageable limiting standard accommodating the principles of neutrality underlying the Treaty. *Ahmad*, 706 F.Supp. at 1042.

██ The appropriate standard by which to define the political offense exception is the "Law of Armed Conflict," the body of international law governing all armed conflict and all nations, rather than the Rules of Engagement, which a government establishes over the conduct of its armed forces at a particular time and place. Activities that could be prohibited under particular Rules of Engagement might be permitted under the Law of Armed Conflict. If the Law of Armed Conflict outlaws an act, the Rules of Engagement of a particular country cannot validate that act.

An army should not be held guiltless if it vindictively slaughters civilians. *Cf. Quinn v. Robinson*, 783 F.2d 776, 799 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986) (court accepts much of the criticism of its decision in *Karadzole v. Artukovic*, 247 F.2d 198 (9th Cir.1957), *vacated*, 355 U.S. 393, 78 S.Ct. 381, 2 L.Ed.2d 356 (1958), in which it characterized as a political offense the killing of hundreds of thousands of civilians in concentration camps in Yugoslavia during the Nazi occupation). The Bible acknowledges that it would be wrong to punish the innocent in Sodom because of the guilt of their neighbors. *Genesis* 18:24–26. *Cf. Association for Human Rights in Israel v. General, Central Command*, H.C.J. 358/88, slip op. (July 30, 1989) (in cases involving army's decision to demolish houses of those suspected of unlawful violent acts, Su-

preme Court of Israel finds that house residents have right of appeal); J. Pictet, *Humanitarian Law and the Protection of War Victims* 125 (1975) (It is "very significant" that an individual civilian "may not be punished for an offense he or she has not personally committed.").

Developing international concern over the effect of hostilities on the innocent have led to an emphasis on protection of civilian non-combatants. *See, e.g.,* J. Pictet, *Humanitarian Law and the Protection of War Victims* 42, 124 (1975); Draper, *The Implementation of the Modern Law of Armed Conflicts,* 8 Israeli L.Rev. 1, 6 (1973). The "Law of Armed Conflict limitation" on the "incidence of violent political disturbance" test provides essential protection to society and is sound in light of our recent experience with international terrorists as well as "wars of liberation or self-determination."

▉▉▉▉ Under the Law-of-Armed-Conflict limitation on the incidence test, a person opposing extradition must prove the acceptability of his or her offense under conventions governing military conduct in the course of armed conflict. Accepting *arguendo* that a petitioner was engaged in a war of "self-determination," *see Protocol I, supra* art. 1(4), 16 I.L.M. at 1397, *reprinted in Documents Supplement, supra,* at 195, he or she must still demonstrate that the actions were consistent with Protocol I, which states in pertinent part:

> In order to ensure respect for and protection of the civilian population and civilian objects, the Parties to the conflict shall at all times distinguish between the civilian population and combatants and between civilian objects and military objectives and accordingly shall direct their operations only against military objectives.

*Protocol I, supra* art. 48, 16 I.L.M. at 1412. *See also The Laws of Armed Conflicts* (D. Schindler & J. Toman eds., 3d ed. 1988) (reprinting Protocol I, together with list and declarations of signatories); H. Levie, *The Code of International Armed Conflict* (1986) (cross-referencing Protocol I with related documents). Protocol I ex-

pressly prohibits attacks on individuals and groups of civilians. *Protocol I, supra* art. 51(2), 16 I.L.M. at 1413, *reprinted in Documents Supplement, supra,* at 202 ("The civilian population as such, as well as individual civilians, shall not be the object of attack."). Article 50, *id.,* defines "civilian" in reference to the Third Geneva Convention's definition of "prisoners of war." In relevant part, a civilian is anyone who is not a member of: "the armed forces of a Party to a conflict, as well as members of militias or volunteer corps forming part of such armed forces," or "other militias and ... other volunteer corps" that are "commanded by a person responsible for his subordinates," have "a fixed distinctive sign recognizable at a distance," "carry arms openly," and "conduct their operations in accordance with the laws and customs of war." Convention (III) Relative to the Treatment of Prisoners of War, Signed at Geneva, 12 August 1949 arts. 4A(1), 4A(2), 6 U.S.T. 3316, 3320, T.I.A.S. No. 3364, 75 U.N.T.S. 135, 138, *reprinted in Documents Supplement, supra,* at 187.

▉▉▉ International covenants, including those like Protocol I which the United States has not ratified, are neither self-executing nor binding on the United States. *See, e.g., Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370, 373–76 (7th Cir.1985) (U.N. Charter and Helsinki Accords); *American Baptist Churches in the U.S.A. v. Meese,* 712 F.Supp. 756, 768–72 (N.D.Calif.1989) (Third Geneva Convention). They do, however, often represent a developing consensus about substantive and procedural due process. *See* I International Comm. of the Red Cross, *Conference of Government Experts on the Reaffirmation and Development of International Humanitarian Law Applicable in Armed Conflicts* 148 (expert notes that Protocol I rules prohibiting attacks on civilians are taken from customary law). American courts may take into account this consensus in interpreting their own Constitution and other laws. *Cf.* M. Frankel with E. Saideman, *Out of the Shadows of Night: The Struggle for International Human Rights* 37 (1989) ("[L]aw, especially international law, is not made only by treaties and

statutes; it is also generated by the customary usage and beliefs of the civilized people of the world.").

Although the United States has not ratified Protocol I, its reasons stem from the Protocol's characterization of wars of self-determination, *see* S. Treaty Doc. No. 100–2, 100th Cong., 2d Sess. iv (1987), and do not indicate disapproval of the Protocol's protection of civilians. In fact, the United States delegation voted to approve the article of Protocol I dealing with the protection of civilians. *See* 3 H. Levie, *Protection of War Victims: Protocol I to the 1949 Geneva Conventions* 164 (1980). The President signed and sent to the Senate for ratification Protocol II, *see* S. Treaty Doc. No. 100–2, 100th Cong., 2d Sess. (1987), which states that in non-international conflicts, "The civilian population as such, as well as individual civilians, shall not be the object of attack." *Protocol II, supra* art. 13(2), 16 I.L.M. at 1447, *reprinted in Documents Supplement, supra,* at 220. The international limitations on acceptable targets of warfare, designed to protect civilians may, for extradition purposes, be deemed embodied in the United States' Constitution's due process clauses.

Most members of the United Nations have had episodes when its armed forces have beaten, killed, starved and otherwise mistreated civilian populations. This dreadful history of abuse does not justify such actions. The fact that members of national armed forces are seldom punished for such acts does not make them any less illegal. The law has an obligation not to recognize such dark brutality under either the rules of war or of civilian insurrection or political opposition. Were a civilian to detonate a bomb in a peaceful marketplace or rake peaceful shoppers with a machine gun to make a political point, this and most civilized countries would not consider such indiscriminate violence an unpunishable political act. Equally abhorrent would be the knowing and deliberate firebombing and machine gunning of a civilian bus. Nor, we assume, would any disciplined army condone such inhumane acts in time of war. *See, e.g., U.S. v. Calley,* 22 C.M.A. 534, 544, 48 C.M.R. 19, 29 (1973), *aff'd sub nom.*

*Calley v. Callaway,* 519 F.2d 184 (5th Cir. 1975) ("An order to kill infants and unarmed civilians ... is ... palpably illegal.").

We recognize the anomaly of the widespread practice during war of blowing up whole cities by air raids and artillery attacks resulting in the wholesale killing of civilians, while condemning by law the deliberate killing of even one civilian. Yet the civilities of war that condemn face-to-face inhumanities do serve to enforce a minimum acknowledgment of the sanctity of life. It keeps alive the hope that the mass inhumanities of wars between and within nations will ultimately be controlled and eliminated.

In a sense, to characterize an act as terrorism is to recognize its political nature while at the same time excluding it from the category of *protected* political crimes. *See* Comment, *Terrorism, Ideology, and Rules of Law,* 1 Touro J. Transnat'l L. 213, 255 (1988) ("[T]errorist acts are a category of politically motivated violence purposely directed at civilian targets."); United States Dep't of State Bull., *Patterns of Global Terrorism: 1987,* at v. (1988) ("Terrorism is premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine state agents, usually intended to influence an audience."); Forte, *Terror and Terrorism: There is a Difference,* 13 Ohio N.U.L.Rev. 39, 42 (1986) (Terrorism is "the systematic and primary use of randomly focused violence by organized groups against civilian targets to effectuate a political objective."); Larschan, *Legal Aspects to the Control of Transnational Terrorism: An Overview,* 13 Ohio N.U.L. Rev. 117, 124 (1986) ("The hallmark of modern transnational terrorism is the 'active' use of violence in states not 'directly' involved in the conflict which results in 'innocent' persons becoming victims for 'political ends.' "). *See also* Bennett, *United States Initiatives in the United Nations to Combat International Terrorism,* 7 Int'l L. 754, 754 (1973) ("[W]e have attempted to identify specific categories of offenses which, because of their grave and inhuman

effect on innocent persons or because of their serious interference with the vital machinery of international life, should be condemned by states of every ideological alignment.").

▮▮▮▮ Offenses that transcend the Law of Armed Conflict are beyond the limited scope of the political offenses the Treaty excludes as bases for extradition. To come within the "relative" political offense perimeter, petitioner must show that: 1) there was a violent political disturbance of such a degree as to constitute in effect a state of civil war; 2) the acts charged were incidental to the disturbance; and 3) the acts did not violate the Law of Armed Conflict.

### 2. Burden of Proof

When the crime alleged is not political on its face, the Treaty between Israel and the United States explicitly places the burden of proof with respect to the political offense issue on the petitioner. Article VI of the Treaty provides in relevant part that extradition shall not be granted:

> [w]hen the offense is regarded by the requested party as one of a political character or if the person sought proves that the request for his extradition has, in fact, been made with a view to trying or punishing him for an offense of a political character.

To satisfy this burden of proof, petitioner must establish the required elements of the relative political offense test. *See Abu Eain v. Adams*, 529 F.Supp. 685, 694–95 (N.D.Ill.1980) (the accused "must show the link between the crimes he allegedly committed and their relation to the political objective;" the burden does not shift to the government after there is evidence of conflict and membership in a political organization), *aff'd sub nom., Eain v. Wilkes*, 641 F.2d 504, 520 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981) (agreeing with magistrate that "simply noting membership in the PLO, but not tying membership to the specific act alleged was insufficient to satisfy the burden petitioner must shoulder in order to invoke the political offense exception"); *In re Re-*

quested *Extradition of Sindona*, 450 F.Supp. 672, 693–94 (S.D.N.Y.1978), *aff'd in relevant part, sub nom., Sindona v. Grant*, 619 F.2d 167, 173 (2d Cir.1980) (accused made no showing that criminal charges brought against him relate to an offense of a political character). *See also Quinn v. Robinson*, 783 F.2d 776, 797 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986) (setting forth two-fold requirement of incidence test).

▮▮▮ A preponderance standard is the appropriate burden level. This is a civil case and the preponderance standard is the norm in such cases. *See Santosky v. Kramer*, 455 U.S. 745, 755, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599 (1982); *Addington v. Texas*, 441 U.S. 418, 423–25, 99 S.Ct. 1804, 1807–09, 60 L.Ed.2d 323 (1979); *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). Deference to the State Department might justify a higher standard such as "clear and convincing," but in almost no cases would there be any practical difference in the outcome. *Cf.* Lubet, *Extradition Reform: Executive Discretion and Judicial Participation in the Extradition of Political Terrorists*, 15 Cornell Int'l L.J. 247, 277 (1982) (one pending bill would require preponderance and another a clear and convincing standard; author prefers higher standard).

### 3. Scope of Review

▮▮▮▮ The political offense issue presents a mixed question of law and fact. Accordingly, Judge Korman's purely factual findings underlying the application of the political offense exception—such as the existence or non-existence of a violent disturbance at the time of the act—must be reviewed under the clearly erroneous standard. The mixed questions—such as whether the alleged crime was incidental to a political uprising—and questions solely of law must be reviewed *de novo*. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir.), *cert. denied*, 479 U.S. 882, 107 S.Ct. 271, 93 L.Ed.2d 247 (1986). For petitioner's protection, the *de novo* standard governs the

review of a magistrate's application of the political offense exception in its entirety.

### 4. Evidence of Political Offense

Petitioner submitted evidence, strongly contested by respondent, that there were severe disturbances in the occupied territory of the West Bank amounting to an insurrection at the time in question, that the bus involved was being used by armed Israeli settlers, and that the bus system was part of the Israeli defense establishment designed to contain and suppress the insurrection. As the detailed analysis by Judge Korman indicates, none of these contentions were proven.

■ The burden of demonstrating that the bus and settlers using it were legitimate military targets rests on petitioner. He pointed out that the civilian status of some settlers, who are armed members of the Israeli defense forces living in fortress-like villages, is ambiguous. Nevertheless, the evidence properly credited by Judge Korman demonstrated that most Israeli citizens living in the occupied territories are part of a "suburbanization movement" to acquire cheaper and more spacious living accommodations near the crowded main cities of Israel, with residents commuting via buses for work, recreation and other incidents of peaceful civilian life. Egged buses such as the one attacked are used throughout Israel and in much of the occupied zone. They have the same ubiquitous presence as do Transit Authority buses in New York City. There was no proof that anyone on the bus was armed. The bus was properly found to be a civilian bus on a civilian route and schedule. The fact that some settlers at some time are part of a paramilitary force and that the Egged buses are sometimes used to support military goals does not establish petitioner's claim that this bus was a legitimate military target at the time of the attack. In fact, petitioner's alleged observations of the bus, showed that the attackers were aware that it was on a regularly scheduled run that passed the point of attack each day at the time it was waylaid.

■ Nor was there proof that at the time in question there was a substantial revolt and widespread violence in the occupied territory. The evidence established that the occupied territory was at that time relatively peaceful. The situation since the beginning of the Intifada in December of 1987 is arguably different. *Cf. Data Base Project on Palestinian Human Rights* 2 (undated) (number of serious injuries claimed in occupied territory from January, 1987 through December 8, 1987 was 180; from December 9, 1987 through December 8, 1988, claimed number was 46,000). The point of reference for this case, however, is April, 1986. There was no indication of violence, except for that attributed to petitioner, at the time and place where the events occurred. General opposition of the population of the territory to the occupation and the desire to terminate it is far removed from the endemic and widespread violence required to establish a political offense exception for murder.

Sporadic acts of violence cannot justify deliberately waylaying a civilian bus operating on a regularly scheduled run and deliberately attempting to kill the civilian driver and civilian passengers. Petitioner's alleged attack, if it took place in the manner charged, must be characterized as a random act of murderous terrorism, rather than a protected political offense.

### III. REQUESTING NATION'S PROBABLE TREATMENT OF PETITIONER

Petitioner contends that should he be extradited to Israel, he would be subjected to torture and cruel and unusual punishment during interrogation to coerce him into confessing the acts alleged; he would not receive even "a semblance of due process" in the Israeli criminal justice system, particularly since any conviction would in all likelihood rest on either his or his alleged accomplices' coerced confessions; and, finally, he would be housed in indecent detention and prison facilities. He contends that extradition under these circumstances violates fundamental principles of due process and human rights.

The claim raises the question of whether a federal court may inquire into the fairness of a requesting country's criminal justice system, including its methods of interrogation, rules of evidence regarding confessions and conditions of detention. If so, the court must determine whether petitioner faces treatment and procedures on extradition so offensive to the court's sense of decency that the habeas corpus writ must be granted and extradition prohibited. This court is empowered to hold an evidentiary hearing to determine the nature of treatment probably awaiting petitioner in a requesting nation to determine whether he or she can demonstrate probable exposure to such treatment as would violate universally accepted principles of human rights.

It should be emphasized that by conducting such an inquiry, we do not make it "the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation." *Jhirad v. Ferrandina*, 536 F.2d 478, 484–85 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). *Accord Demjanjuk v. Petrovsky*, 776 F.2d 571, 583 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986). But neither can another nation use the courts of our country to obtain power over a fugitive intending to deny that person due process. We cannot blind ourselves to the foreseeable and probable results of the exercise of our jurisdiction. *Cf. Jhirad*, 536 F.2d at 485 (requiring demanding state to show that petitioner would not be prosecuted for a crime for which the statute of limitations had run); *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960) ("federal court's sense of decency" may limit extradition); *In re Extradition of Burt*, 737 F.2d 1477, 1486–87 (7th Cir.1984) ("fundamental conceptions of fair play and decency" and "particularly atrocious procedures or punishments" may be considered by the court); *Plaster v. United States*, 720 F.2d 340, 348, 354 (4th Cir.1983) ("individual constitutional rights" must be weighed to determine if extradition would be "fundamentally unfair"); *United States ex rel. Bloomfield v. Gen-*

*gler*, 507 F.2d 925, 928 (2d Cir.1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975) (extradition may be "antipathetic to a federal court's sense of decency").

Reflective of our country's concern for the extraditee is the fact that our State Department has insisted that the requesting nation protect those extradited. It requires, for example, that as a condition of surrender a person found guilty *in absentia* be retried. *Gallina v. Fraser*, 278 F.2d 77, 78 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). Moreover, this court was informed that the State Department will observe the trial abroad to ensure that its conditions are fulfilled.

### A. Due Process Exception to the Rule of Non–Inquiry

#### 1. Generally

The theme that treaties and other international obligations should not inhibit fundamental individual rights policies of the United States is a powerful one. *Cf. Societe Nationale Industrielle Aerospatiale v. United States District Court, S.D. Iowa*, 482 U.S. 522, 554, 107 S.Ct. 2542, 2550, 96 L.Ed.2d 461 (1987) (treaty interpreted to leave United States rules for discovery in civil cases intact); Henkin, *Rights: American and Human*, 79 Colum. L.Rev. 405, 411 (1979) (American rights are in some sense supreme because they "antecede the Constitution and are above government"). The inherent conflict between national sovereignty and obligations under treaties which appear to limit that sovereignty is well illustrated by the right of extraditing nations to refuse to violate their own sense of individual justice. *See Barr v. United States Dep't of Justice*, 819 F.2d 25, 27 (2d Cir.1987) (The "treaty may authorize only such governmental action as is in conformity with the Constitution."); *Reid v. Covert*, 354 U.S. 1, 16–18, 77 S.Ct. 1222, 1230–31, 1 L.Ed.2d 1148 (1957) (supremacy of Constitution over particular treaty); L. Henkin, R. Pugh, O. Schachter & H. Smit, *International Law: Cases and Materials* 184–85 (2d ed. 1987).

Treaty obligations will sometimes need to be read and interpreted by the courts of a nation in the context of the fundamental law of the nation that entered into them. In the United States that law includes those principles embodied in the due process clauses of the fifth and fourteenth amendments to the Constitution guaranteeing extensive protections to the criminally accused. *Cf.* L. Henkin, *Foreign Affairs and the Constitution* 255 (1972) ("In regard to foreign relations ... 'due process of law' requires fair procedures for aliens as for citizens ... in civil as in criminal proceedings, before administrative bodies and in courts."). This principle, we emphasize, does not require us to impose the details of our Constitution or procedural system on a requesting country's judicial system. *See Neely v. Henkel,* 180 U.S. 109, 122, 21 S.Ct. 302, 306, 45 L.Ed. 448 (1901). It does entail an obligation not to extradite people who face procedures or treatment that "shocks the conscience" of jurists acting under the United States Constitution and within our current legal ethos. *See Rosado v. Civiletti,* 621 F.2d 1179, 1195–96 (2d Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980) ("Thus, although the Constitution cannot limit the power of a foreign sovereign to prescribe procedures for the trial and punishment of crimes committed within its territory, it does govern the manner in which the United States may join the effort."). *Cf. Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952).

As pointed out in Section III A(1), *supra,* international custom and treaties limiting attacks on civilians are not derogatory to our Constitution. Rather they expand and give substance to a developing enriched concept of rights of the individual that harmonizes with our own constitutional developments.

The introductory note to the subchapter on extradition of the Restatement points out, "The requested state retains an interest in the fate of a person it has extradited" as well as the probable fate of those whose extradition is sought. *Restatement, supra,* at 557. Extradition may be refused, for example, where the requested nation has a substantial ground for believing that the person sought "would not receive a fair trial or would risk suffering other violations of human rights" in the requesting nation. *Id.* § 475 comment g, at 562, § 476 comment h, at 571. "Thus, while extradition treaties obligate the parties to extradite according to their terms, nearly all extradition treaties leave some room—at least by implication—for discretion by the requested state not to extradite in certain cases." *Id.* at 558. *See Sindona v. Grant,* 619 F.2d 167, 176 (2d Cir.1980) ("[T]he executive branch ... is empowered to make the final decision on extradition and has assumed the discretion to deny or delay extradition on humanitarian grounds."); S. Treaty Doc. No. 100-20, 100th Cong. 2d Sess. 7 (1988) (executive has discretion to refuse to extradite if extraditee is in danger of being subjected to torture); Kester, *Some Myths of United States Extradition Law,* 76 Geo.L.J. 1441, 1478 (1988).

Three independent protections are erected against this country's participation in the wrongful deed of surrendering fugitives to likely abuse by the requesting state. First, Congress and the executive branch do not enter into extradition treaties with countries in whose criminal justice system they lack confidence. *Restatement, supra,* at 558 (noting absence of extradition treaties with the U.S.S.R., People's Republic of China, North Korea and Iran). Second, when conditions change after an extradition treaty is concluded, without formal denunciation or suspension of the treaty, the executive of the requested state—here the Secretary of State—may refuse to extradite. *Id.;* S. Treaty Doc. No. 100-20, 100th Cong., 2d Sess. 7 (1988). Third, the courts in this country, constituting an independent branch of government, charged with defending the due process rights of all those who appear before them, may grant the accused prisoner a writ of habeas corpus blocking extradition.

### 2. United States Precedent

The existence, and ambit, of this third, court imposed, protection is not settled.

Under the traditional rule of non-inquiry, claims of probable lack of due process in the requesting nation would fall within "the exclusive purview of the executive branch" and courts would not inquire into the procedures which await the accused upon extradition. *Sindona v. Grant*, 619 F.2d 167, 174 (2d Cir.1980). *Accord, e.g., Garcia–Guillern v. United States*, 450 F.2d 1189 (5th Cir.1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972); *Peroff v. Hylton*, 542 F.2d 1247 (4th Cir.1976), *cert. denied*, 429 U.S. 1062, 97 S.Ct. 787, 50 L.Ed.2d 778 (1977). "[S]upervising the integrity of the judicial system of another sovereign nation ... would directly conflict with the principle of comity upon which extradition is based." *Jhirad v. Ferrandina*, 536 F.2d 478, 485 (2d Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). *Cf. Glucksman v. Henkel*, 221 U.S. 508, 512, 31 S.Ct. 704, 705, 55 L.Ed. 830 (1910) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair.").

 Despite this limiting line of cases, the courts, as an independent branch of government, have a duty to stand between the executive and the accused where a case of abdication of State Department responsibility for the protection of the accused has been made out. Courts may not compromise "that judicial integrity so necessary in the true administration of justice." *Mapp v. Ohio*, 367 U.S. 643, 660, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961). The courts may not be parties to abusive judicial practices, even where sensitive foreign relations matters are concerned. *See Barr v. United States*, 819 F.2d 25, 27 n. 2 (2d Cir.1987) ("[It is a] recognized principle that, regardless of the degree of American government involvement in the conduct of a foreign sovereign, the federal courts will not allow themselves to be placed in the position of putting their imprimatur on unconscionable conduct.").

 Despite the fact that the executive branch has a constitutional duty and right to conduct foreign policy, and the legislative and executive branches together have the duty and right to enter into treaties for extradition, the courts are not, and cannot be, a rubber stamp for the other branches of government in the exercise of extradition jurisdiction. They must, under article III of the Constitution, exercise their independent judgment in a case or controversy to determine the propriety of an individual's extradition. The executive may not foreclose the courts from exercising their responsibility to protect the integrity of the judicial process. A court must ensure that it is not used for purposes which do not comport with our Constitution or principles of fundamental fairness.

 The court's powers and responsibilities are necessarily greater in foreign extradition cases than in extradition between states of this country. *See Uniform Criminal Extradition and Rendition Act*, 11 U.L.A. §§ 3–107, 3–101, 3–102 (Supp. 1989). This is so because of the constitutional mandate for extradition between states of the United States. United States Constitution, art. IV, § 2, cl. 2. Fairness of hearings or methods of incarceration in the requesting state are not inquired into by the courts of the extraditing state. *Sweeney v. Woodall*, 344 U.S. 86, 73 S.Ct. 139, 97 L.Ed. 114 (1952); *Pacileo v. Walker*, 449 U.S. 86, 101 S.Ct. 308, 66 L.Ed.2d 304 (1980). Nor do the governors have the same broad authority as the Secretary of State to refuse extradition. *Drew v. Thaw*, 235 U.S. 432, 35 S.Ct. 137, 59 L.Ed. 302 (1914); *Puerto Rico v. Branstad*, 483 U.S. 219, 107 S.Ct. 2802, 97 L.Ed.2d 187 (1987). The reason for the reduced responsibility of a state extraditing to another state as compared to the United States extraditing to another nation is obvious: If a demanding state violates the rights of an extradited person, he or she can seek the protection of the fourteenth amendment of our federal Constitution. The person extradited to a foreign nation can generally seek only whatever protection that nation affords. *But cf.* Section III A(3), *infra* (discussion of European Court of Human Rights, *Soering* Case).

The Second Circuit has repeatedly acknowledged that it could "imagine situa-

tions where the [accused], upon extradition, would be subject to procedures or punishment so antipathetic to a federal court's sense of decency as to require reexamination" of the rule of non-inquiry. *Gallina v. Fraser*, 278 F.2d 77, 79 (2d Cir.), *cert. denied*, 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960). *Accord United States ex. rel. Bloomfield v. Gengler*, 507 F.2d 925, 928 (2d Cir.1974), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975); *Rosado v. Civiletti*, 621 F.2d 1179, 1195 (2d Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). *See also Demjanjuk v. Petrovsky*, 776 F.2d 571, 583 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Arnbjornsdottir–Mendler v. United States*, 721 F.2d 679, 683 (9th Cir.1983). The *Gallina* exception to the rule of non-inquiry has apparently yet to be invoked to prevent extradition since thus far no petitioner has persuasively demonstrated that extradition would expose him to unconscionable abuse. *See, e.g., Demjanjuk v. Petrovsky*, 776 F.2d at 583 ("There is absolutely no showing in this record that Israel will follow procedures which would shock this court's 'sense of decency.' "); *Arnbjornsdottir–Mendler v. United States*, 721 F.2d at 683 ("In light of Iceland's outstanding human rights' record and appellant's uncorroborated prediction of maltreatment, the district court had no obligation to hold an evidentiary hearing to consider the claim.").

### 3. International Precedent

The present status of international and human rights law on this issue is demonstrated by the *Soering Case*, decided by the European Court of Human Rights of the Council of Europe in Strasbourg on July 7, 1989. Slip sheet 1/1989/161/217. There was strong evidence that Soering, a West German citizen, had assisted in the commission of a homicide in Virginia. Soering was arrested in Great Britain and ordered extradited to Virginia, pursuant to a treaty between the United States and the United Kingdom. The European Court intervened upon Soering's application charging the United Kingdom with a breach of its obligations under various articles of the European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, 213 U.N.T.S. 221, 224 (1955), *reprinted in Documents Supplement, supra*, at 466. (the "Convention"). In particular, Soering claimed that by ordering his extradition to Virginia, the United Kingdom would subject him to the risk of languishing for years on death row—a fate he contended would constitute a violation of article 3 of the Convention which provides: "No one shall be subjected to torture or to inhuman or degrading treatment or punishment." 213 U.N.T.S. at 224, *reprinted in Documents Supplement, supra*, at 467.

The European Court adopted the principle that the requested country bears a responsibility to measure the conditions in the requesting country against article 3 of the Convention "where substantial grounds have been shown for believing that the person concerned, if extradited, faces a real risk of being subjected to torture or to inhuman or degrading treatment or punishment in the requesting country." *Soering Case*, slip sheet at 27. The Court found that although the Convention is not considered to be part of United Kingdom law, "the English courts can review the 'reasonableness' of an extradition decision in the light of" such factors. *Id.* at 38.

In an unanimous decision, the Court rejected extradition:

[H]aving regard to the very long period of time spent on death row in such extreme conditions, with the ever present and mounting anguish of awaiting execution of the death penalty, ... [Soering's] extradition to the United States would expose him to a real risk of treatment going beyond the threshhold set by Art. 3.

*Id.* at 35. It based its decision upon evidence demonstrating that it would probably take at least six years to decide the defendant's fate after conviction and that there was a substantial possibility that he would experience the severely damaging psychological and physical conditions of death row for from six to eight years. *Id.* at 17. Apparently, the European Court believed

414

that the protections of article 3 of the Convention are greater than those that would be provided by the courts of Virginia and the Supreme Court of the United States under our due process and cruel and unusual punishment clauses of the United States Constitution.

The *Soering* case arguably went too far in limiting extradition based upon probable conditions in the requesting country. Its decision perhaps can be justified as a matter of equity if not law on the ground that defendant would not go unwhipped of justice even were he not extradited to Virginia. He was a German national who could be tried for the crime in West Germany where the maximum penalty would be life imprisonment. That country was also seeking his extradition. *Id.* at 22. Soering agreed not to oppose West Germany's request. *Id.* at 8. This factual distinction seems legally irrelevant to the issue of the propriety of extradition to Virginia. *Id.* at 34 (majority found this possibility of extradition to a third country not "material," but given some weight in obtaining "a fair balance of interests").

■ In considering *Soering*, it is significant that the European Court of Human Rights recognized that a court's determination of whether to extradite entails a responsibility to consider the interests of the community in its safety from terrorists and other criminals. The Court declared:

[I]nherent in the whole of the Convention is a search for a fair balance between the demands of the general interest of the community and the requirements of the protection of the individual's fundamental rights. As movement about the world becomes easier and crime takes on a larger international dimension, it is increasingly in the interest of all nations that suspected offenders who flee abroad should be brought to justice. Conversely, the establishment of safe havens for fugitives would not only result in danger for the State obliged to harbour the protected person but also tend to undermine the foundations of extradition. These considerations must also be included among the factors to be taken into account in the interpretation and application of the notions of inhuman and degrading treatment or punishment in extradition cases.

*Id.* at 27. Thus, just as national policies and international norms are taken into account by American courts ascertaining the scope of the political offense exception, *see* Section IIE(1) *supra*, so too must these considerations enter into the assessment of whether the likelihood of particular treatment in the requesting country constitutes such a violation of due process and fundamental fairness as to prevent extradition.

*Soering* constitutes an important precedent on the refusal to extradite because of anticipated torture, cruel conditions of incarceration or lack of due process at trial in the requesting country. It reflects a persuasive though non-binding international standard. *Cf. Demjanjuk v. Petrovsky*, 776 F.2d 571, 582 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) ("The law of the United States includes international law," *citing The Paquete Habana*, 175 U.S. 677, 712, 20 S.Ct. 290, 304, 44 L.Ed. 320 (1900)). *Cf.* United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment art. 3, GAOR A/39/506 (1984), 23 I.L.M. 1027, 1028 (1984) ("No State Party shall ... extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture."); S. Treaty Doc. No. 100–20, 100th Cong., 2d Sess. 7 (1988) (reprinting Convention, together with message of transmittal recommending ratification).

The opinion in *Soering* sets forth factors a court should consider in assessing the severity of ill-treatment, including "all the circumstances of the case, such as the nature and context of the treatment or punishment, the manner and method of its execution, its duration, its physical or mental effects and, in some instances, the sex, age and state of health of the victim." *Soering Case*, slip sheet at 30. The European Court of Human Rights has also giv-

en definition to the vague terms "inhuman and degrading treatment and punishment":

> Treatment has been held by the Court to be both "inhuman" because it was premeditated, was applied for hours at a stretch and "caused, if not actual bodily injury, at least intense physical and mental suffering," and also "degrading" because it was "such as to arouse in its victims feelings of fear, anguish and inferiority capable of humiliating and debasing them and possibly breaking their physical and moral resistance."

*Id.*

 Torture and cruel and unusual punishment must be defined for our purposes as including threats and other inhuman psychological harms including trickery designed to cause despair. The effect of psychological pressure may be even more painful and more effective than physical pressure in destroying a person's dignity or in overcoming the will of the person interrogated, thus inducing false confessions. Even if the probable inhumane act is unauthorized by the requesting nation and is applied by those abusing power it could constitute a basis for non-extradition. *See Altun v. Federal Republic of Germany,* 36 Eur.Comm'n H.R. 209, 233–35 (1983) (in action challenging extradition, torture incidents considered even though Turkish government had discouraged them by prosecuting police officers responsible).

### B. Burden of Proof

 As a general rule our courts should rely on the State Department's initial approval and forwarding of the extradition request to the appropriate United States Attorney as certification that the requesting state may be relied upon to treat the accused fairly. *See* S. Treaty Doc. No. 100–20, 100th Cong., 2d Sess. 7 (1988) (Secretary of State should use its discretion to ensure that extraditee will not be subject to torture). The Department has better resources than the courts to make appropriate inquiries. Particularly since it is charged by Congress under sections 116(d) and 502B(b) of the Foreign Assistance Act of 1961 with making an annual review of human rights conditions throughout the world, the State Department may be assumed to be sensitive to the problem. *See, e.g.,* United States Dep't of State, 101st Cong., 1st Sess., *Country Reports on Human Rights Practices for 1988* (S.Prt. 101–3, 1989). There may, however, be instances where immediate political, military or economic needs of the United States induce the State Department to ignore the rights of the accused. Should such cases occur, the courts must be prepared to act.

 There is a presumption in favor of the State Department's and a foreign nation's good faith exercise of its powers. Nevertheless, "the presumption of fairness routinely accorded the criminal process of a foreign sovereign may require closer scrutiny if a [petitioner] persuasively demonstrates that extradition would expose him to procedures or punishments 'antipathetic to a federal court's sense of decency.'" *Rosado v. Civilleti,* 621 F.2d 1179, 1195 (2d Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 153, 66 L.Ed.2d 70 (1980). Because foreign policy is involved, the State Department's decision that extradition is proper will be given considerable weight. The burden of proof is on petitioner to come forward with a written submission showing a substantial probability that he or she can rebut the presumption of State Department propriety in assuming the fairness of the judicial process in the requesting country. *Cf.* Fed.R.Evid. 301 (shifting burden of coming forward). If petitioner makes such a threshhold showing, the rule of non-inquiry yields and an evidentiary hearing may be conducted on the issue of probable due process to the accused in the requesting country. The Federal Rules of Evidence do not apply to such extradition hearings. Fed.R.Evid. 1101(d)(3).

 In previous cases of extradition to Israel, the courts have repeatedly and uniformly found that the State Department properly concluded that Israeli courts would act fairly. *See, e.g., Demjanjuk v. Petrovsky,* 776 F.2d 571, 583 (6th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986); *Eain v. Wilkes,* 641

F.2d 504, 512 n. 9 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981). Nevertheless, in the instant case, petitioner submitted reports of torture of those who were thought guilty of acts of violence against Israelis in the occupied territory, of trial by military rather than civilian courts, and of unacceptable conditions of imprisonment after conviction. These included the State Department's own report on human rights conditions in Israel which acknowledges that "where security concerns predominate, the strictures [against torture, and other cruel, inhuman or degrading treatment or punishment] have been violated." United States Dep't of State, 101st Cong., 1st Sess., *Country Reports on Human Rights Practices for 1988,* at 1367 (S.Prt. 101–3, 1989). The violations petitioner cited suffice to rebut the presumption. *Cf.* Fed.R.Evid. 301.

■ Because a finding of probability of abuse in the requesting country in effect negates this country's obligations under the Treaty and may have ramifications for our foreign relations with that country, arguably petitioner should be required to demonstrate by "clear and convincing" evidence that upon extradition he or she will face a lack of due process, or torture or other cruel or inhuman treatment in the requesting country. As already indicated, because this is a civil case, we prefer to impose only a preponderance standard on petitioner. Accordingly, to reject the magistrate's certification of petitioner for extradition, the court, after an evidentiary hearing, must be satisfied that it is more probable than not that the requesting country will treat the accused unfairly, denying him or her the fundamental protection of due process, and will take inadequate measures to prevent cruel and inhuman treatment. We are not, as apparently British courts are, limited to deciding that "no reasonable Secretary of State could have made an order for [extradition] in the circumstances." *Soering Case,* at 38.

### C. Hearing in This Court

#### 1. Proof on Torture and Inhuman Treatment

At the hearing, petitioner introduced a number of reports from reputable organizations such as the Lawyers Committee for Human Rights (Dec.1988) and Amnesty International (Aug.1988) discussing the current conflict between Israel and the Arab population in the occupied territories. These documents are of limited significance with respect to the incident before us which occurred before the current uprising. Also introduced were *Report of the [Israeli] Commission of Inquiry into Methods of Interrogation of the General Security Service in Regard to Hostile Terrorist Activity of 1987* (referred to as the "Landau report" after the chairman of the Commission, former Supreme Court Chief Justice Moshe Landau), and the United States Dep't of State, 101st Cong., 1st Sess., *Country Reports on Human Rights Practices for 1988,* at 1378 (S.Prt. 101–3 1989) ("Reports of beatings of suspects and detainees continue, as do reports of harsh and demeaning treatment of prisoners and detainees."). *See also* Occhiogrosso, *The Shin Beth Affair: National Security Versus the Rule of Law in The State of Israel,* 11 Loy.L.A. Int'l Comp.L.J. 67, 111–12 (1989) (describing Landau report findings).

Torture and other forms of inhumane treatment are now outlawed by civilized countries. *See, e.g.,* United Nations Convention Against Torture, Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, GAOR A/39/506 (1984), 23 I.L.M. 1027 (1984); European Convention for the Protection of Human Rights and Fundamental Freedoms, Nov. 4, 1950, § I, art. 3, 213 U.N.T.S. 221, 224 (1955), *reprinted in Documents Supplement, supra,* at 466, 467. Probable use by the requesting nation against a potential extraditee would require denial of extradition.

The interrogation practices permitted in some security cases according to the Landau Report, although at one time widely used by American police, would no longer be countenanced in American courts. *See, e.g., Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944) (violation of due process where confession obtained

by incommunicado interrogation); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (statements obtained during incommunicado interrogation without full warning of constitutional rights are inadmissible as having been obtained in violation of privilege against self-incrimination). *See generally* 3 J. Wigmore, *Evidence* § 822 (Chadbourn Rev. 1970) (describing shift in last forty-five years from trustworthiness to due process rationale).

■■■ To suggest that certain practices may exist as to some prisoners in Israel is not, however, to prove that petitioner is likely to be subject to them. It is to that critical issue that we turn.

■■■■ First, most of the credible evidence, including contemporaneous reports of observers from the State Department, indicates that no person tried in Israel after extradition by this country has been denied due process. The trials were open to the public; held in Israel proper by civilian courts presided over by regular independent judges of the court system; defendants were represented by their own counsel; Anglo–American standards of presentation of evidence, subject to cross examination of witnesses and hearsay and other protections, were relied upon; appeals were afforded; and no torture or other inhumane treatment of defendants was permitted. See, for example, the cases of *Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1198, 89 L.Ed.2d 312 (1986) and *Eain v. Wilkes*, 641 F.2d 504 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 390, 70 L.Ed.2d 208 (1981).

Testimony by a witness for petitioner that Ziad Abu Eain was mistreated during his interrogation and after his subsequent conviction is flatly contradicted by the declaration of Andre M. Surena, a State Department official who observed the *Eain* trial in Israel on behalf of the United States in his official capacity as Assistant Legal Advisor for Human Rights and Refugees. *Cf. Ziad Abu Eyan v. The State of Israel*, C.A. 450/82 (1983) (Supreme Court of Israel sitting as a Court of Criminal

Appeals found statements prior to trial were made freely). Professor Alan Dershowitz of Harvard Law School, witness for respondent, testified that he observed portions of the trial of John Demjanjuk. His testimony that Demjanjuk and his counsel made no allegations of torture or other mistreatment is credited. Petitioner has failed to prove that any extraditee has suffered abuse by Israeli officials.

Second, petitioner does not fit the profile of the ordinary security suspect against whom the secret police might have reason to exert pressure. Because over three years have elapsed since his alleged offense occurred, and because petitioner has been incarcerated in the United States for two of those years, it is highly unlikely that petitioner has any current information of terrorist activities in Israel or the occupied territories. By now even his alleged general knowledge of the Abu Nidal organization is stale. As the Landau report states, the "top priority" of interrogation is to gather information "for the purpose of preventing and foiling [terrorist acts].... Obtaining evidence to bring a suspect to trial is not the top priority of [the Shin Beth's] investigative work." *Landau report, supra* ¶ 2.17.

Third, and perhaps most important, Israel has formally provided assurance that petitioner, if extradited, will not be subject to torture or other inhuman and degrading treatment. The government of Israel has certified that petitioner, were he to be extradited, would not be tortured or otherwise coerced into confessing and that he would receive a fair trial by a civilian tribunal in Israel proper. *See Appendix, infra.*

The United States is justified in seeking such assurances by an extension of the doctrine of specialty. That doctrine places an obligation on the requesting nation not to try the defendant for a crime other than the one for which he was extradited, or to punish him or her more severely than the law would have allowed at the time of extradition; if acquitted the person must be given an opportunity to depart from the nation. *Restatement, supra*, § 477, at 578. In short, the extraditing nation has a con-

tinuing interest in assuring fairness to the extraditee.

Given Israel's assurance of proper treatment, the previous experience of extraditees from the United States and the futility of attempting to obtain useful security information from this petitioner, it is improbable that petitioner will be abused upon extradition to obtain information or a confession from him. Petitioner has not met his burden of proof on this issue.

2. Proof on Indecent Prison Conditions

■ Testimony of Sami Esmail, formerly incarcerated in Israeli prisons, was offered to prove that the Israeli civilian prison system is such that were petitioner convicted, he would serve his term of imprisonment under inhumane conditions. Petitioner's proof, even if fully credited, does not show that conditions in the regular civilian prisons (except in very limited periods of temporary overcrowding due to a sudden influx of new prisoners) would shock the conscience of our Supreme Court.

That the Israeli prisons are overcrowded, a characteristic they share with prisons in this country and elsewhere, is not dispositive. Cf. Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) ("double celling" of prisoners not cruel and unusual punishment prohibited by eighth and fourteenth amendments); Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("double-bunking" of pre-trial detainees not a violation of due process). Double or triple bunking and temporary use of mats on floors of cells, plus the smell of toilets in the cell, are common in many prisons, even if deplorable. So, too, the small "X" cells, "a prison within a prison," used for internal discipline are not much different from our own. Mr. Esmail's admitted refusal to participate in the work of the prison print shop would probably warrant discipline under American penal practice.

Mr. Esmail stated that he was hit twice—once by a fellow cell-mate who disliked him and once by a guard. His complaints were, he admitted, fully investigated by higher prison authorities. Though, from his point of view, the authorities improperly found that the prison was not at fault, the protective procedure seems sound.

He also stated that he heard that rapes took place in the showers. This too is a deplorable circumstance of modern penology worldwide. He himself was not so molested.

Finally, Mr. Esmail complained that although caloric intake was not limited, the prison fare consisted too much of bread and potatoes. This kind of diet is not recommended, but, given the limited amount of funds available in some areas of the world, it cannot be said to constitute a violation of the rights of prisoners outside of the United States.

Professor Alan Dershowitz testified that he had made systematic studies of prison systems throughout the world, including that of Israel. For the most part, those studies were based on his personal observations. Professor Dershowitz concluded that with the exception of the superior Scandinavian and United States Federal prison systems, the Israeli system compared favorably with prisons in this country and the western world. His testimony on this score is credited.

Israel has provided formal assurance that petitioner, if extradited, will be detained and, if convicted, incarcerated in a civilian detention facility in Israel. There he may be visited by members of his family, by his attorney and by officials of the United States Embassy. Petitioner has not demonstrated that were he convicted in Israel, his prison service would be so harsh as to be inhumane.

3. Integrity of the Requesting Nation's Criminal Justice System

■ An important factor in deciding how a potential extraditee would be treated is the nature of the requesting nation's criminal justice system. The court may take judicial notice of the nature of another nation's system of justice. See, e.g., United States v. Salim, 664 F.Supp. 682, 688 (E.D.N.Y.1987) (judicial notice of nature of foreign judicial system appropriate on motion to suppress evidence gathered abroad), aff'd, 855 F.2d 944 (2d Cir.1988); Murty v.

*Aga Khan,* 92 F.R.D. 478, 482 (E.D.N.Y. 1981) (same appropriate on motion to dismiss on forum non conveniens grounds).

Criminal trials by civilian courts within Israel are conducted at the trial and appellate levels by professional independent jurists sensitive to the rights of defendants. *See, e.g.,* A. Barak, Judicial Discretion 202–03 (1989); H. Baker, *The Legal System of Israel* 197–207, 211–19, 223–28 (1968); Shetreet, *Judicial Responsibility, in* Israel Reports to the 11th International Congress of Comparative Law 88 (1982); Shetreet, *Protection of Individual Rights,* 12 Israeli L.Rev. 32 (1977). Trials are conducted as in England and the United States, with protection of defendants' rights an important goal. *See, e.g.,* Harnon, *The Right of Silence in Israel, in* Israel Reports to the 9th International Congress of Comparative Law 143, 143 (1974) ("right to silence in Israel accompanies a person from his first contact with the police until the end of legal proceedings"); Harnon, *A New Draft of an Evidence Code: Are Revolutionary Changes Desirable?,* 18 Israeli L.Rev. 99 (1983) (comments on 1981 draft of evidence code); Libai, *Twenty–Five Years of Criminal Procedure in Israel,* 10 Israeli L.Rev. 225 (1975); Shalgi, *Evidence Obtained by Trickery,* 2 Israeli L.Rev. 137 (1967) (developments limiting use of evidence obtained by trickery parallel those in the United States). *Cf.* Harvard–Israel Cooperative Research, *An Evidence Bill for Israel* (1953) (bill was not adopted, but contains notes on Israeli practice); Stein, *Bentham, Wigmore and Freedom of Proof* (Book Review), 22 Israeli L.Rev. 245 (1987) (Israel's approach to evidence in light of United States and English scholarship). Except for the absence of a jury, trials are conducted under an adversary system in essentially the same way as criminal trials in the United States.

▬▬ Under the Israeli law of confessions it is possible that confessions presently excluded under American law would be admissible. Relying on a due process rationale, American law currently forbids the admission of confessions obtained through offensive police methods even if the state-

ments are reliable. *See Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and its progeny. Essentially the Israeli law resembles the American law of confessions as it existed prior to the post-World War II developments of the Warren and Burger Courts, when a confession was admissible so long as it was free of influence which made it unreliable. 3 J. Wigmore, *Evidence* § 822 (Chadbourn Rev.1970). The Israeli law of confessions follows Wigmore's view that trustworthiness and probative force should control and that coercion should not result in automatic exclusion. *Id.* § 843 ("[T]here is nothing in the mere circumstance of compulsion to speak in general ... which creates any risk of untruth."). *See Appendix, infra.* We cannot say on pain of not extraditing that the greater protections currently available to a defendant under the American law of confessions is due under the law of other nations.

Petitioner has submitted evidence, particularly through the testimony of Leah Tsemel, Esq., an experienced Israeli defense counsel, that there has been some attenuation of procedural protections afforded defendants in Israel in recent years in security cases. Petitioner's evidence was not, however persuasive that there had been such a deterioration in the civilian Israeli criminal justice system and in the sense of justice of its judges as to present a substantial due process threat to this petitioner.

It has not been demonstrated that the Israeli judiciary will fail to meet its obligation to fairly evaluate any admissions in light of possible coercion. The issue of probative force of any admitted confession is likely to be fully and fairly adjudicated. A full and fair appeal will follow any conviction. Petitioner has not met his burden of demonstrating that he will receive less than a fair trial upon extradition to Israel.

The State Department has indicated that it plans to assign an American representative to consult with petitioner and to observe the prosecution of the case before, during and after trial. In *Jimenez v. Aristeguieta,* 311 F.2d 547 (5th Cir.1962), *cert.*

*denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963), the Secretary of State conditioned extradition on the understanding that Jimenez would be tried only for the crimes specified and ordered a representative of the United States government to observe the proceedings to determine that the condition was not violated. *See Restatement, supra,* § 477 reporters' note 2, at 581–82. *See also Sindona v. Grant,* 619 F.2d 167, 176 (2d Cir.1980) (Secretary of State has discretion to narrow terms of extradition approved by magistrate and may condition surrender on petitioner's continued access to American counsel).

■ The fact that petitioner is an American citizen places an independent obligation on the State Department to ensure against mistreatment. An open trial in a civilian court with observation by a representative of the United States furnishes ample protection against abuse.

## IV. CONCLUSION

Petitioner has failed to meet his burden of proving that if extradited he would be subject to procedures or treatment so offensive to our nation's sense of decency as to obligate the court to block his extradition. The evidence establishes that he will receive full and satisfactory due process protections afforded under the laws of Israel. Petitioner's claims of violations, past and prospective, of his rights by this country and Israel are unfounded.

The writ of habeas corpus is denied. The petition is dismissed. Extradition may proceed. Dismissal of the petition is stayed for ten days to permit application for a further stay to the Court of Appeals.

So ordered.

## APPENDIX

STATE OF ISRAEL

DORIT BEINISH, I hereby declare that:

1. I am State Attorney for the State of Israel and I have practiced law for twenty-two years. In my official capacity, I, and my duly appointed representatives, represent the State of Israel in all matters in which the State of Israel is a party, including all criminal prosecutions. In addition, I have personally participated in numerous criminal investigations and trials. During my practice in the State Attorney's Office, I have had responsibility for the execution of the criminal laws of the State of Israel and I have become knowledgeable about the laws of Israel and the decisions of our courts.

2. On 25th June 1987, Israel submitted a Request to the United States for the Extradition of Mahmoud El–Abed Ahmad, also known as Mahmoud Abed Atta (hereinafter, "Atta"), so that he could be tried in Israel on charges of murder, attempted murder, causing harm with aggravating intent, attempted arson, and conspiracy to commit a felony. I am familiar with the evidence and the charges in this case, and with the content of the files of Israel regarding this matter. If Atta is extradited to Israel in accordance with the Request, he will be tried before the District Court of Jerusalem for the criminal offenses set out in the Request.

3. The District Court of Jerusalem has jurisdiction over this matter. It is not a military court. It is a court before which civilian criminal offenders are tried. The Court will be composed of three legally trained, professional judges, who owe allegiance to no one but the law and are subject to no authority other than the law.

4. In accordance with Article XIII of the Convention on Extradition between Israel and the United States, Atta will be tried in Israel for only those offenses set forth in Israel's Request for Extradition. Atta will not be tried before any military court or tribunal and will not be charged with any offenses provided for under any military law or regulations of Israel.

5. The offenses set out in Israel's request to extradite Atta are ordinary criminal charges, under Israel's Penal Law, which would be brought against any person who was accused of similar acts.

6. Atta's trial in Israel will be a criminal trial, conducted in conformity with established judicial procedures. Atta will be af-

forded all rights and protections set out in Israel's Penal Law, Criminal Procedure Law, and Evidence Ordinance, as well as those rights set forth in all other laws pertaining to criminal trials. In criminal trials in Israel, the accused is presumed to be innocent and the State has the burden of proving the guilt of the accused beyond a reasonable doubt. Atta will be permitted to be represented by counsel of his choosing from lawyers who are members of the Israel Bar. All trial proceedings will be translated into a language in which Atta is fluent. Atta's attorney will be permitted to cross-exam witnesses presented by the prosecution. Similarly, in accordance with Israel's Criminal Procedure Law, Atta will be entitled to have his own witnesses testify on his behalf. If Atta so chooses, he may testify on his own behalf.

7. Upon Atta's extradition to Israel he will be held in a civilian detention facility in accordance with Israel's Prison Ordinance and regulations promulgated pursuant thereto. Atta will be detained in a prison facility in Israel and not in the Administered Territories. Subject to the regulations governing the operations of Israel's prisons, Atta will be permitted visits by members of his family. Atta may receive an unlimited number of visits by [h]is attorney during regular visiting hours at the prison facility. Officials of the United States Embassy may make arrangements to visit Atta while he is incarcerated. If Atta is convicted of any of the charges alleged in the Extradition Request, his detention will be continued in a prison facility under the same terms and conditions set forth above.

. . . . .

■ ... the Court inquired about the application of Section 10A of the Evidence Ordinance Law, 5733–1973 (hereinafter referred to as the "Evidence Ordinance"). The legislative intent in enacting Section 10A was to protect a witness that provides a statement in a criminal proceeding and to bring criminals to justice. The legislative objective was to make a prior, out of court statement admissable in order to eliminate any benefit that might otherwise be de-

rived from asserting improper pressure upon a witness to change his testimony at trial or refuse to testify. Section 10A only applies to the statements of *witnesses* in a criminal proceeding and does not apply to the *defendant's* statements as it relates to his particular trial. A defendant's statement is dealt with by the provisions of Section 12 of the Evidence Ordinance.

Section 10A(a) provides as follows:

A written statement made by a witness out of court shall be admissible as evidence in a criminal proceeding if—

(1) its making has been proved at the trial and

(2) the person who made it is a witness at the trial and the parties have been given an opportunity to examine him and

(3) the testimony, in the opinion of the court, differs from the statement in a material particular or the witness denies the contents of the statement or alleges that he does not remember its contents.

As a rule, Section 10A(a) governs the admissability of prior out of court statements except in the limited circumstances set forth in Section 10A(b). Section 10A(b) provides:

The court may admit a statement referred to in subsection (a) even if the person who made it is not a witness either because he refuses to testify or is incapable of testifying or because he cannot be brought to court since he is not alive or cannot be found, provided that the court is satisfied, from the circumstances of the case, that improper means have been used to dissuade or prevent the person who made the statement from giving testimony.

Since 1981, the Supreme Court of Israel has ruled several times that the "improper means" used to prevent a witness from testifying, referred to in Section 10A(b), must come from a source related to the defendant. In this case, Section 10A(b) does not apply because the witnesses are in prison serving their sentences. They will be brought to testify unless the defendant or someone related to him exerts undue

pressure on the witnesses not to testify or causes their death or disappearance. Further, under Section 10A(b), it is the prosecutor that carries the burden of establishing, to the court's satisfaction, that improper methods were used to prevent the witness from being available to testify in court.... Section 10A(c) permits a court to accord the out of court statement weight and credibility if the court finds indicia of truth. Finally, the court may not convict a person on the basis of a prior out of court statement without something else in the record to strengthen the finding. *See* Section 10A(d).

. . . . .

The admissability of the defendant's confession remains a matter within the court's discretion pursuant to Section 12 of the Evidence Ordinance and it is the prosecutor, that at all times, bears the burden of establishing that the confession was "freely and voluntarily" given. Where such evidence is not produced or it is withheld, for whatever reason, the confession is not admissable.

. . . . .

Finally, we offer our assurance that if Atta is extradited to Israel, his interrogation will not employ torture, physical or psychological, or inhumane treatment or improper means, as described in the testimony before the Court. This statement does not mean, implicitly or explicitly, that Israel uses any inhumane methods of interrogation, at any time, in order to [elicit] information.

DORIT BEINISH
STATE ATTORNEY
MINISTRY OF JUSTICE